# EXHIBIT A



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
WASHINGTON, D.C. 20460

AUG 30 2012

OFFICE OF
CIVIL RIGHTS

**UPS Shipping Label No.**
Label No.: 1Z A5F 819 25 9582 5740

**In Reply Refer to:**
EPA File No.: 01R-95-R9

Debbie Raphael
Director
California Department of Toxic Substance Control
P.O. Box 806
Sacramento, CA 95812-0806

Re:   **Dismissal and Closure of Title VI Complaint**

Dear Director Raphael:

The purpose of this letter is to inform you about the U.S. Environmental Protection Agency's (EPA) Office of Civil Rights' (OCR) dismissal and closure of complaint 1R-95-R9 filed on December 12, 1994, under Title VI of the Civil Rights Act of 1964 (Title VI) by the Center on Race, Poverty and the Environment and the California Rural Legal Assistance Foundation on behalf of Padres Hacia una Vida Mejor, California, El Pueblo para el Aire y Agua Limpio, and Concerned Citizens of Westmorland (Padres complaint). In addition, while the letter briefly summarizes the investigation and findings, please refer to the enclosed Investigative Report (IR) for a full description.

The Padres complaint raised allegations of discrimination against Latinos by multiple state and county agencies related to the siting, public participation processes, permitting and associated alleged impacts of California's three commercial hazardous waste disposal facilities: the Kettleman Hills facility located 3 miles southwest of Kettleman City; the Buttonwillow facility located 8 miles west of Buttonwillow; and the Imperial facility located 6 miles west of Westmorland. OCR dismissed claims against all state and county agencies with the exception of the California Department of Toxic Substances Control (DTSC).

At the outset, OCR notes that while complainants allege that these facilities are the only hazardous waste facilities in California and they are located in predominantly Latino communities, this investigation did not address the siting of these facilities or any potential zoning or land use issues. The decisions to site these facilities were made years before the complaint was filed by entities that are not recipients of EPA assistance. Therefore, OCR does not have jurisdiction over these particular siting decisions. OCR's investigation was limited to the actions of DTSC, which is a recipient of EPA assistance. As discussed in detail in the enclosed IR, OCR investigated complainant's allegations involving a) the public participation

processes associated with these three facilities, and b) specific alleged impacts resulting from the permitting of these facilities.

   a) Public Participation Processes

The Padres complaint raised three specific allegations regarding public involvement in DTSC's decision-making processes: (1) DTSC failed to make changes to permit conditions as a result of public comments resulted in disparate impacts on Latinos;[1] (2) DTSC discriminated against Latinos by conducting inadequate outreach activities for a 1994 permit action at the Imperial facility;[2] and (3) during its permitting processes, DTSC accepted and relied upon the discriminatory decision making processes of Imperial, Kern, and King counties in violation of Title VI.[3]

   b) Disparate Impacts from Permitting

The Padres complaint contained general allegations of impacts from air pollution, groundwater contamination, rat bites, stigma, earthquakes, economic impacts, and stress.[4] OCR's investigation began by broadly assessing potential impacts from the permitting and operation of these facilities. In November of 1997, OCR investigators interviewed local residents in the three communities of Kettleman City, Buttonwillow, and Westmorland and representatives from the Center for Race, Poverty and the Environment. A summary of the alleged health impacts raised in these interviews is in Appendix A of the IR. In order to determine which potential impacts to analyze, OCR considered the complaint, these interviews, and subsequent correspondence from the complainants.[5] In addition, OCR relied on its existing policy to consider those impacts that may be within the recipients' scope of authority to regulate.

The Title VI Investigation

The scope of OCR's investigation was broad and OCR's administrative file for the Padres complaint is voluminous. It includes materials provided by the complainants; by DTSC in response to several requests for information; by the facilities; and other relevant materials that OCR found through its investigation. OCR conducted the majority of this investigation by reviewing the relevant materials including: scientific and epidemiological studies, environmental impact reports, facility permits and permit applications, monitoring reports, inspection reports, risk assessments, health studies, and public participation records prepared by state and local agencies, by the facilities, or by contractors to the agencies or the facilities.

---

[1] Letter dated November 7, 1995, from Luke Cole, Center on Race, Poverty and the Environment, to Office of Civil Rights, EPA, page 21.
[2] Letter dated November 7, 1995, from Luke Cole, Center on Race, Poverty and the Environment, to Office of Civil Rights, EPA, pages 18-20.
[3] Complainants Reply to Responses Filed by the Department of Toxic Substances Control and Laidlaw, November 7, 1995 at 8-9.
[4] Title VI Complaint at 4. Letter dated June 8, 2010, from Brent Newell, Center on Race, Poverty and the Environment, to Lisa P. Jackson, Administrator, US EPA, (CRPE 2010 letter) page 4.
[5] Title VI Complaint at 4. Letter dated June 8, 2010, from Brent Newell, Center on Race, Poverty and the Environment, to Lisa P. Jackson, Administrator, US EPA, (CRPE 2010 letter) page 4.

Before relying on any analysis or environmental or health assessment report prepared by an entity other than EPA, OCR reviewed the quality of the data and the analyses contained in each document to evaluate its scope, relevance, completeness, and accuracy. In reaching its decision, OCR considered these factors to assess the appropriate degree of reliance to be given the evidence presented in those reports. After evaluating the studies and analyses, OCR determined it did not have enough information to make a decision regarding impacts from particulate matter, air toxics, accidental releases, and ozone precursors. Therefore, OCR conducted its own modeling or other analysis when investigating those allegations. The documents OCR relied upon to make its decision are listed in the References section of the IR.

Findings

To make an affirmative finding of intentional discrimination, OCR must conclude that for the allegation under consideration, the record demonstrates that it was more likely than not that a "challenged action was motivated by an intent to discriminate."[6] To make a finding of adverse disparate impact, OCR must be satisfied that the record demonstrates that it was more likely than not that both an adverse impact resulted from the recipient's action and that the impact is disparate between the applicable group (Latinos) and others (*e.g.*, non-Latinos).

Public Involvement in DTSC Decision-Making

With regard to the allegation that DTSC's failure to make changes to permit conditions as a result of public comment was discriminatory, OCR found that the allegation is factually unsupported by the record. DTSC received no comments during the 1994 public participation processes for the Kettleman Hills and Imperial facilities' permits. On the other hand, DTSC made changes to the 1995 draft Buttonwillow permit in response to comments. Therefore, OCR dismisses the allegation.

With regard to the allegation that DTSC discriminated against Latinos by conducting inadequate outreach activities for a 1994 permit action at the Imperial facility, OCR determined that DTSC's mailing list, which only included four residents of the community, appears to have been inadequate in providing actual notice to persons potentially impacted by the permitting decision. In addition, there is no record that DTSC broadcast notice of its public meeting over local radio stations, in either Spanish or English, as required by regulation and recommended in DTSC's 1994 Public Participation Manual. While OCR's investigation did not uncover any explanation for the apparent inadequacy of the public participation process for the Imperial facility, the investigation also did not reveal that the Westmorland residents were treated disparately based on their race or national origin. Thus the record does not support a finding of a Title VI violation.

Given the passage of time, OCR reviewed DTSC's current public participation program and planned public participation activities and found that DTSC's planned public participation activities for an active permit modification for the Kettleman Hills facility differ substantially from, and are a significant improvement over, those conducted for the Imperial facility in 1994.

---

[6] *Elston v. Talladega County Bd. Of Educ.*, 997 F.2d 1394, 1406 (11th Cir. 1993), reh'g denied, 7F.3d 242 (11th Cir. 1993).

3

In addition, DTSC stated that it intends to apply the upcoming Kettleman Hills facility process to future permitting activities at the Buttonwillow and Imperial facilities.

OCR closed its investigation into this allegation because DTSC is taking the necessary steps to ensure meaningful public participation. Because closure of the investigation into this allegation was based, in part, on DTSC's representations regarding future activities, OCR requests that DTSC submit an annual report for 2012, 2013, 2014, 2015, and 2016, within 60 calendar days of the end of each calendar year, documenting its public participation processes, including communication strategies, in connection with any DTSC permitting activity at these three facilities. In addition, OCR strongly recommends that DTSC revise its written guidance materials to reflect its improved public participation practices and include this information in the annual reports.

With regard to the allegation that during its permitting processes, DTSC violated Title VI by accepting and relying upon the Environmental Impact Reports (EIRs) that were the product of allegedly discriminatory public participation processes by Imperial, Kern, and King counties (Counties), OCR determined that DTSC was not responsible for the conduct of the Counties because it had no authority to control that process.[7] OCR found that DTSC did not violate Title VI in its use of the EIRs because: (1) DTSC considered the EIRs as only one of many pieces of relevant information; (2) DTSC did not control the County processes, and (3) DTSC conducted its own public participation process[8] in connection with its permitting activities, and may have considered comments that were not raised in the California Environmental Quality Act process. Therefore, OCR dismisses the allegation.

Adverse Health Impacts

OCR investigated the potential impacts of the facilities with respect to: accidental releases from hazardous chemicals; groundwater contamination and drinking water; surface water contamination and drinking water; earthquakes; particulate matter (PM) (*e.g.,* dust) emissions; ozone precursor emissions; and air toxics emissions. A more detailed description of the basis for each finding is contained in the IR.

*Accidental Releases from Hazardous Chemicals*

With regard to the allegation that Latinos are bearing a disproportionate risk from accidental releases on-site and that there was either no or inadequate emergency response planning for the facilities, OCR found that the risk of adverse health effects from accidental releases from any of the three facilities is highly unlikely to be above thresholds of concern and that the contingency plans in place at all of the facilities are adequate. For all three facilities, OCR conducted modeling for worst-case scenario fires and found that the potential lifetime

---

[7] The Padres complaint, also filed with the U.S. Department of Housing and Urban Development (HUD), alleged that the Counties' public participation process violated both Title VI and Title VIII (fair housing law). HUD took the lead on the investigation of the Counties' activities and dismissed the complaint.

[8] OCR's decision acknowledges that the public participation process at Imperial was potentially inadequate and addresses that finding in the context of the previous allegation, in which it concludes that circumstances have changed sufficiently to ensure meaningful public participation.

4

cancer risk from dioxins at several receptor locations were below 1 in a million. The modeling results for worst-case hypothetical spill scenarios showed concentrations would remain below Acute Exposure Guideline Levels, which represent threshold exposure benchmarks for the general public, at nearby receptors. Therefore, OCR dismisses the allegation.

*Groundwater Contamination*

With regard to the allegation that Latinos are bearing a disproportionate risk from the facilities' alleged groundwater contamination affecting drinking water, OCR found no risk of adverse health effects from contamination of groundwater by any of the three facilities. For the Buttonwillow and Imperial facilities, no evidence of waste release from the facilities or groundwater contamination was identified. For the Kettleman Hills facility, while contamination had been identified in 1986, the associated waste management units at the facility were closed or rebuilt. Monitoring of the groundwater at Kettleman is ongoing. Since 1994, federal regulations require that there be "no migration" of hazardous waste outside the boundary of the waste management unit. Nevertheless, OCR's assessment found that even a hypothetical release to groundwater would not result in adverse health impacts.

The groundwater beneath the Kettleman Hills facility flows away from Kettleman City and its drinking water wells, and, in fact, the groundwater is in a different geologic formation from the Kettleman City's drinking water wells. OCR's investigation found no hydraulic connection between the groundwater flow under the facility and those drinking water wells. In addition, wells located in the direction of groundwater flow from the facility draw from different groundwater formations than the one under the facility. This conclusion is corroborated by the findings of the CalEPA/CDPH 2010 study finding that the groundwater beneath the facility flows away from the town and cannot affect the town's drinking wells.

While OCR did not find that the groundwater beneath the Buttonwillow facility is contaminated, any groundwater that may be contaminated by the Buttonwillow facility would take well over 500 years to reach the nearest drinking water well. The City of Westmorland does not use groundwater for its drinking water supply. Any groundwater that may be contaminated by the Imperial facility would take well over 1000 years to reach the nearest drinking water well 15 miles away. For these reasons, OCR dismisses the allegation as to all three facilities.

*Surface Water Contamination*

With regard to the allegation that Latinos are bearing a disproportionate risk from surface water contamination affecting drinking water, OCR found very little risk of adverse health effects from the facilities contaminating surface water. Kettleman City and Buttonwillow both use groundwater, not surface water, for their drinking water supply. For the Imperial facility, the nearest surface water is not a drinking water supply. Moreover, the potential for any of the three facilities' activities to impact surface waters is extremely low for several reasons, including: low rainfall, geography, the distance from surface water discharge points; and facility drainage engineering controls. Therefore, OCR dismisses the allegation.

*Earthquakes*

With regard to the allegation that Latinos are bearing a disproportionate risk from a release due to an earthquake, OCR found very little risk of adverse health effects from releases of hazardous waste from the facilities resulting from an earthquake. Each facility meets not only the RCRA C design requirements, but also some RCRA D design standards and supplementary California requirements to reduce impact from seismic events. There are no active faults within 3000 feet of any of the facilities or within 200 feet of any hazardous waste management units. The facilities' waste containment systems are designed to withstand the maximum credible earthquake (MCE). If any of the facilities' units did not withstand the MCE, the most likely result of a design failure is a release to groundwater. As discussed above, there is no evidence suggesting that the residents of Kettleman City, Buttonwillow, or Westmorland could be exposed to or otherwise impacted by any current or future groundwater contamination originating from the facilities. Therefore, OCR dismisses the allegation.

*Particulate Matter Emissions*

With regard to the allegation that Latinos are bearing disproportionate potential impacts from particulate matter (PM) emissions from these facilities, OCR found that due to ongoing dust suppression practices, PM emissions from the facilities were found to be less than the likely emissions from the pre-construction naturally occurring emissions. OCR found that each facility employs dust suppression practices. Also, OCR's modeling of dust emissions occurring on the undeveloped lands prior to facility construction showed that the highest estimated daily emissions for the facility operations and construction are lower than the estimates of dust emissions occurring on the undeveloped lands. Given the likely overestimation of the emission estimates and the reduction in $PM_{10}$ emissions estimated for each case, these findings are likely to hold for $PM_{2.5}$ as well. OCR's current policy is that net decrease in emissions would generally not be considered the basis for a finding. Therefore, OCR dismisses the allegation.

*Ozone Precursor Emissions*

With regard to the allegation that Latinos are bearing disproportionate potential impacts from ozone precursor emissions from the facilities, OCR found that the facilities' emissions do not have a discernible impact on ozone levels at any site in the San Joaquin Valley or Imperial County. EPA's Office of Air and Radiation (OAR) conducted an analysis that concluded that it would require a substantial change in ozone precursor emissions to produce a discernible change in ozone concentrations on a single day. OAR found that the facilities contribute a very minimal amount to the total ozone precursor emissions for the areas. For example, the maximum-allowable emissions from the facility are less than two hundredths of one percent of the ozone precursor emissions for the San Joaquin Valley, and actual emissions of the facility are even smaller. Considering all the potential emission sources and processes in these areas, the nature of ozone chemistry, and other factors provided in its analysis, OAR concluded that the facilities' emissions do not have a discernible impact on ozone levels at any site in the San Joaquin Valley or Imperial County. Therefore, OCR dismisses the allegation.

*Air Toxics Emissions*

With regard to the allegation that Latinos are bearing a disproportionate risk from air toxics, OCR found very little risk of adverse health impacts because inhalation cancer risks and non-cancer hazard indices from facility emissions are below threshold levels of concern. OCR found that no current residential locations have estimated lifetime cancer risks higher than 1 in a million from all the chemical emissions combined at each facility. Also, the highest estimated risks were located at the facility boundary buffer zone perimeter (inside which no residences can be located). OCR's finding relied partly on the CalEPA/CDPH 2010 study that included an evaluation of the potential for air emissions from the Kettleman Hills facility to affect air contaminant levels in Kettleman City. The CalEPA/CDPH study also concluded that it is unlikely that airborne contaminants from the Kettleman Hills facility pose health risks. Therefore, OCR dismisses the allegation.

Conclusion

Based upon the investigation and analyses described in the IR, OCR dismisses and closes this complaint because no violation of Title VI was found. If you have any questions or need clarification regarding this letter and its contents, please contact Helena Wooden-Aguilar, Assistant Director of the External Compliance and Complaints Program via telephone at (202)564-0792 or via electronic mail at Wooden-Aguilar.Helena@epa.gov, or by mail at: U.S. EPA, Office of Civil Rights (Mail Code 1201A), 1200 Pennsylvania Ave., N.W., Washington, D.C. 20460-1000.

Sincerely,

Rafael DeLeon
Director

Enclosures

cc: Jared Blumenfeld, Regional Administrator
Region 9

Lisa Garcia, Senior Advisor for Environmental Justice
(1101A)

Stephen G. Pressman, Associate General Counsel
Civil Rights and Finance Law Office (2399A)